CORRECTED MEMORANDUM OF DECISION
On December 15, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Milagros G. to her two children, Pedro B. and Angelique M. It also sought the termination of these children's fathers: Pedro's unknown CT Page 11758 father, Julio or John Doe, and Angelique's father, Angel M. The termination petitions allege that Milagros has failed to rehabilitate, so that she could parent these children. Both children were adjudicated neglected and uncared-for children in prior proceedings. Further, it is alleged that the children have been denied, by reason of an act of parental commission or omission, including but not limited to sexual molestation or exploitation, severe physical abuse or a pattern of abuse by each of the parents, the care guidance and control necessary to their physical, educational, moral or emotional well being. Last, they allege that there is no ongoing parent-child relationship between the children and their mother. The allegations against John Doe are abandonment and no ongoing-parent child relationship. The allegations against Angel, the father of Angelique, are abandonment, his failure to rehabilitate and that he has no ongoing parent-child relationship with Angelique. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), (C) and (D). The maternal grandmother was permitted to intervene for dispositional purposes and on May 25, 2000, made an oral motion for transfer of custody and guardianship of Pedro and Angelique to her.
The trial on the termination petitions was held over three days on May 23 and 25 and concluded on June 21, 2000. The court had continued the trial to the third date for receipt of evidence regarding notice to the unknown father of Pedro and testimony concerning DCF's efforts to locate him. On July 12, 2000, the petitioner filed a motion for technical correction to check the box on the petition indicating abandonment of this child by this father. Although the statement of facts and the social study provided information concerning abandonment, the actual around had not been checked. The court granted the correction on July 16, 2000. For the reasons stated below, the court grants the petitions for termination of the parental rights of Milagros G. and Angel M. to their biological daughter, Angelique, on the grounds of their failure to rehabilitate so that they could parent this child. The court further finds that Angel M. has abandoned Angelique, in the statutory meaning of that term. The court finds as to Pedro that John or Julio D. has abandoned Pedro and has no ongoing parent-child relationship with him. Milagros, as noted above, has failed to rehabilitate so that she could parent Pedro and has physically abused him. The court grants the termination based on these findings. The remaining grounds are dismissed. The court also denies the maternal grandmother's motion for transfer of custody and guardianship.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Milagros G., mother of Pedro and Angelique.
CT Page 11759
Milagros is now twenty-six years old. She was herself as a child involved with DCF as there were some issues of physical abuse by her mother. By the time she was seven, she was removed from her mother and placed with her father and his girlfriend, who later became her stepmother. She remained there for less than a year when she was returned to her mother's care. She continued in school, where she was a special education student. When she was eight, she was diagnosed as having cognitive limitations, which, among other things, manifested themselves in her difficulty in recognizing cause/effect relationships, and in controlling her impulses. These problems continue to plague her to this day.[2]
Milagros finished the tenth grade in high school and then dropped out of school in 1990 when she began her relationship with Angel M., the father of three of her four children, the two oldest of whom are not subject to this petition. When she was eighteen, her oldest child Angel, Jr. was born. Two years later, when Milagros was twenty, Lisa was born. Her third child was born a year and half later as a result of a relationship she had with Julio or John Doe, an individual she identified by his first name only and who was then fifteen years old. By the time of Pedro's birth on August 8, 1996, Angel M., the father of her two oldest children, was released from incarceration and he and Milagros were then living together. On August 3, 1997, her fourth child, Angelique, was born. Angel M. is the acknowledged father of this child.
Milagros was never able to care for any of her children independently, due to her cognitive limitations. She required significant assistance from her family members. She also was involved in alcohol and marihuana abuse. She has acknowledged that Angel was a drug dealer. DCF first became re-involved in her life regarding her children in 1995, because of her inability to take care of her two oldest children at that time. At that time, Milagros was homeless and unable to care for them. By 1996, Milagros had voluntarily placed them with DCF. The children came into the care of her father and his wife, who were DCF foster parents.
(a) The Neglect proceedings
As previously noted, Pedro's father is unknown. Angel M., the father of the other children, was released from incarceration in the late spring and early summer of 1996, while DCF was attempting to secure housing and assistance for Milagros, who nonetheless determined she preferred to live with Angel. She had made no plans for Pedro's birth. Pedro was born when Milagros was in the bathroom of the apartment she shared with Angel, as she puts it "in the toilet." Milagros has credited Angel with saving Pedro's life as he assisted Milagros during the birth process. Shortly after his birth, Pedro was also placed with his other half-siblings with CT Page 11760 his maternal grandfather and his wife. By October 18, 1996, Milagros revoked the voluntary placement and Pedro was returned to his mother's care.
The events which precipitated the neglect proceedings began when a parent-aide, who had been referred to the home by DCF through the Child Guidance program, brought Pedro to the hospital on May 21, 1997. During a home visit on that date, the worker noted bruising around Pedro's right eye, the bridge of his nose and underneath his left eye. At the hospital x-rays were taken and Milagros was unable to offer a reasonable explanation of what had happened to Pedro.
The court received the affidavits of the various physicians who examined the child and the x-rays. One ER physician made no diagnosis as the x-rays were not completed. Another physician, Dr. Flynn, did a preliminary reading and found them negative. A third, Dr. Creatura, stated he did see findings consistent with old injuries and chronic trauma to the left femur, left tibia and humerus. Dr. Flynn noted that based on this final assessment, removal of Pedro from the home was indicated.[3]
Another physician examined Pedro on May 21, 1997 at the request of DCF. Dr. Allyson Driggers found the examination to reveal that "it is very likely that Pedro has been the victim of chronic trauma, consistent with intentional injury." In her opinion, the child was at imminent risk of danger if left in his mother's care. Dr. Betty Spivack also reviewed these records at the request of DCF. On June 2, 1997, after a denial of two applications for an OTC, the court granted a third application for an OTC and Pedro has remained in foster care since that time.
Milagros has variously reported that Angel abused the child. In July 14, 1997, when questioned by the police in connection with this matter, she, after denying she had done anything to the child, said she hit him a few times. When asked about the injury on the child's leg, she stated:
 "I was pulling the leg and sometimes I used to pick him up and shake him." Why would you shake him? Like you know when I get angry, I have a lot of anger in me and distress and I feel like hurting him and I give him to my mother." When asked about what she hit the child with, she stated "I hit him with my hand, like smacked him to. stop crying."[4]
Angelique was born to Milagros and Angel M. on August 3, 1997, just shortly after Milagros confessed to her physical abuse of Pedro. Angelique did not leave the hospital in the care of either parent because an order of temporary custody for her was granted on August 5, 1997. (Arnold, J.) On July 2, 1997, a month prior to his daughter's birth, CT Page 11761 Angel was incarcerated because he had violated the terms of his probation. As a result of her removal, neither biological parent has ever cared for Angelique on a day-to-day basis.
On September 3, 1997, both Angelique and Pedro were adjudicated neglected and uncared-for children and committed to the care and custody of DCF for a period of one year. Their commitments have been extended since that time and they remain in DCF foster care placement.
(b) Court expectations and services
Considerable services were offered to Milagros during the entire time DCF was involved with her, beginning with the DCF involvement with her two oldest children, Angel and Lisa.[5] She was cooperative with the first set of court ordered expectations concerning Pedro and Angelique on September 3, 1997. She attended the various programs to which she was referred and she worked with the Boys Village In-Home services, which began in November, 1997. Those services were extended for her until June, 1998. She attended parenting classes, had a substance abuse evaluation with individual and group therapy sessions at the Southwest-Community Health Center, as well as. classes in domestic violence at the YWCA. Indeed, the court appointed evaluator, Dr. Rosado, noted that the services were well suited to Milagros's abilities and she had apparently made tremendous progress while attending them.
Visits with the oldest children, Lisa and Angel were extended during this time increasing to overnight visitation. Those visits went well and the plan was to reunify Milagros with these two children. However, on an unscheduled visit by the DCF social worker on March 12, 1998, the worker observed Milagros in the home with the two children with a belt across her lap. When questioned about it, Milagros stated that she used it "when the kids got out of control" She stated she never used the belt on the children, but that it was more of a threat. Later on during that visit, the worker observed that she spanked Angel for yelling and pushing at her. DCF determined after this visit to curtail overnight visitation with the oldest children. Pedro and Angelique had supervised visits during this time.
The efforts towards reunification continued, and Lisa was returned to her mother's care on June 12, 1998, with monitored overnight and weekend visitation scheduled while still remaining a committed child. Less than one month later, on July 1, 1998, a case manager at the Headstart program Lisa was attending noted a bruise on the child's forehead and several bruises on her neck. Lisa reported to the teacher that "someone hit me upstairs at Mommy's." The DCF investigation concluded that Milagros had hit her daughter with a belt and that after this, Angel M. had grabbed CT Page 11762 the child around the neck.
On August 12, 1998, after a police investigation, Milagros was again arrested for risk of injury to a minor and assault in the 3rd degree. These charges were combined with the earlier charges filed concerning her treatment of Pedro in 1997. After pleading guilty to two counts of risk of injury to a minor, one count of assault in the 2nd degree, all felony counts, and assault in the 3rd degree, Milagros was sentenced on February 5, 1999 to ten years imprisonment, suspended after five years with five years of probation. She was incarcerated at the time of trial and will remain so for some time.
After the failed reunification attempts, DCF concluded that:
 "Due to the physical abuse and subsequent incarceration, Ms. G.'s limitations and, and her inability to control her anger and frustration, Ms. G. is not considered capable of providing a safe and stable home environment for any of her children and is not capable of addressing their special needs."[6]
The court also concludes, based on this evidence, that while Milagros attended the services to which she was referred and cooperated with DCF, she did not meet the actual goals set by the expectations. The changes in behavior that such services are designed to produce unfortunately did not take place. When her daughter Lisa was with her, Milagros was unable to keep the inevitable child-rearing frustrations from overwhelming her and reacted by inflicting physical punishment on her. It is not necessary for each child to be returned to Milagros for the court to find she is unable to parent them. And Milagros is bearing the consequences of her actions by her lengthy incarceration.
(c) Psychologist's evaluations
A total of twelve court-ordered psychological evaluations of Milagros, Angel M., the maternal step-grandmother and the children were completed between August, 1997 through early February, 2000 by Dr. Rudolfo Rosado. Dr. Rosado testified that in 1997 Milagros admitted to him that she had hit Pedro and was remorseful about her actions. She was upset, he testified, that she had displaced her anger on the child. By October, 1998, she had changed her position and maintained that Angel had hit the child. Dr. Rosado was questioned about her change in position and his belief of Milagros's truthfulness. He indicated that he based his conclusion that she had struck her child on a combination of things, which included Milagros's awareness of the trouble she was in and her defensiveness. CT Page 11763
When questioned about his opinion concerning Milagros's ability to care for her children, he testified that "if Mom had a parent-aide at home all the time, twenty-four hours a day all week, then she could do this." From this testimony, the court concludes that the only way in which Milagros could parent would be to have a surrogate parent in the home at all times. Dr. Rosado said his opinion and his concerns related to two particular areas. He testified that there are "periods of time when she is impulsive, then she regrets this . . . This is consistent with mild to moderate mental retardation," he noted. "She engages in concrete thinking and becomes frustrated. There are mildly retarded individuals who can compensate, but others then for whom the frustration causes more significant difficulties." The implication was that Milagros falls in the latter category.
As noted earlier, Dr. Rosado believed that the services that were offered to Milagros were suited to her needs. He testified that this:
 "represented the best possible scenarios for protective service work. She had a good relationship with the DCF worker, she was referred to and supported and truly engaged in services. During the second evaluation, I saw truly remarkable and impressive growth. It was entirely exceptional."
Dr. Rosado had earlier recommended the return of her oldest children to her, one at a time, beginning with Lisa. By the time of his February, 2000, evaluation, he had changed his position. In his opinion, the youngest three children, Lisa, Pedro and Angelique "did not display any positive or secure attachment with either parent."[7] In particular he noted that "Angelica never displayed any comfort with any of them and in a session with her parents, Angelica seemed to favor the observing psychologist,"[8] referring to himself. He further noted that Milagros had been unable to achieve sufficient personal gains to parent her children appropriately. He did not believe that it was in the children's best interest to permit further time to re-establish a parent child relationship with an eye towards reunification. His opinion as to Milagros was based on several factors, including her lack of progress even with considerable services and the fact that this lack of progress would likely be repeated in the future, which would place the children at "potential risk."
On October 14, 1998, further reunification efforts were found not to be appropriate (Rogers, J.) On December 15, 1998, visitation with Angelique ended, due to her negative reactions to her mother. At the time of trial, due to a court order on December 15, 1999, there was monthly CT Page 11764 visitation with each parent at the correctional facilities in which they are housed.
A counselor for the York Correctional Center testified on behalf of Milagros. The counselor stated that at present Milagros's earliest release date is November 10, 2002. However, if she applies for and becomes eligible to participate in a special program at the facility and is able to successfully complete it, she would become eligible for release a year earlier. At present, Milagros has not applied for this program.
2. Angel M., the father of Angelique.
Angel is now thirty-four years old. He has a tenth grade education. He has not cooperated with DCF and there is not a great deal of information about his early personal life. He has reported he was physically abused and neglected and that his parents engaged in substance abuse. He was at one point placed in a group home as an adolescent, but ran away and supported himself by stealing food and using as well as selling drugs. His criminal record as an adult includes several felony convictions. In 1993, he was convicted of sale of narcotics, robbery in the 1st degree and possessing an illegal weapon. He received a seven year jail sentence. Once released, he violated the terms of his probation and was incarcerated again on July 2, 1997, a month before Angelique was born. He received a sentence of fifteen months. He was released in May, 1998 and by May 17, 1999, he was arrested and charged with possession of narcotics. He was convicted after a guilty plea on June 30, 1999 and received an eighteen month sentence. He is presently incarcerated.
Following his last release from incarceration, he and Milagros began living together again. Their time together did not continue long as Milagros was arrested in August, 1998 and then convicted and sentenced in February, 1999. By October, 1998, Angel was evicted from the apartment for non-payment of rent and his whereabouts were unknown to DCF for some time. Angel did not comply with the expectations set for him by the court and by the service agreement, which he signed with DCF on 4/17/1998. In that agreement he was to "remain free from criminal court involvement," something he did not accomplish. He was to remain drug free and have a drug evaluation, which he did not complete. He was to cooperate with referrals for parenting classes, anger management and domestic violence, which were to be arranged around his work schedule. The DCF social worker testified that while referrals were made, Angel only marginally complied until he was again incarcerated.
Angel was evaluated by Dr. Rosado as well as Milagros. When he testified, Dr. Rosado noted that Angel clearly loves his children and is CT Page 11765 very caring and affectionate with them. However, Dr. Rosado was also aware that Angel demonstrated "psychological impulsivity and did not follow through with the things that he should be doing." In order for Angel to be considered a resource for his child, he would need to "demonstrate a lifestyle where he is able to abstain from drugs and maintain socially acceptable behavior." Dr. Rosado stated that he has concerns for any person "who comes out of incarceration and there would need to be a year or two of a stable life to inspire confidence that he could care for the children." He also noted that in general "a good predictor of future function has to do with a review of past function." The court finds, from the evidence, that Angel has not been able to abstain from drug use in the past nor has he been able to lead his life in accordance with socially acceptable norms. Dr. Rosado found in his evaluation that it was not in the best interests of the children to allow further time to re-establish a parent-child relationship with a view towards reunification. He believes that the termination of both parents' rights to their children was in the children's best interests.[9]
 3. John or Julio Doe, the unknown father of Pedro G.
As indicated, notice of these proceedings was provided to John or Julio Doe by publication. Milagros was also questioned by DCF about Pedro's paternity. She had no additional information to provide, except that the young man, then age fifteen, was known to her as Julio and that she did not know his last name. No individual has come forward as a result of the publication of notice regarding Pedro. No one claiming to be his father was involved in Pedro's life. It is axiomatic that he therefore does not have an ongoing-parent child relationship with Pedro, and the court so finds.
4. The children, Pedro G. and Angelique M.
Pedro is now four years old. His birthday was on August, 1996. In his foster care placement, he received birth to three therapeutic services for his developmental delays. In 1998, Pedro came to live with the foster family where he presently resides and where his sister Angelique has been since birth. At this home, many of his earlier troubling behaviors, including hair pulling, banging his head and temper tantrums, have lessened considerably. The foster mother and the social worker both testified that he has made significant progress. He also receives counseling and the foster mother works with him concerning his difficulties. It is a stable and nurturing home, the social worker testified, that has provided well for both children. The foster mother testified that she and her husband would like to adopt both children, should they become available for adoption. CT Page 11766
Angelique is just three years old. She was born on August, 1997. She has been with the present foster family since she was three days old. She exhibits some difficulties with language due to the Spanish and English she speaks. She has been evaluated and has not required any Birth to Three services, although she will continue to be monitored for developmental delays. She is very shy of strangers and is receiving therapy to address this difficulty.
There have been parental visits with all the children since the beginning of the DFC cases. Both Milagros and Angel had visitation in 1997 and 1998. During the spring and summer of 1998, the DFC case notes reflect that many visits went well and that the children were glad to see their parents. At the end of 1998, DFC discontinued visits with the parents because, as the social worker testified, the children were having negative reactions to them. In November. 1999. DCF determined to resume visits to see if the children could handle them. On December 15, 1999, they were resumed on a monthly basis with both parents at the correctional facilities where they were housed by court order. (Frankel, J.)
There was much testimony about one visit Milagros had with all four of her children at York on March 31, 2000. The counselor who works with inmates at the prison testified concerning her observations about the visit. She testified and her notes[10] reflect that all of the children were excited to see their mother and had their arms open to her. Only Angelique did not react in this way, but soon began to be involved with books and toys at the visitation location. She and her mother had a delightful time together, the counselor noted. When the visit ended, the other children were able to hug their mother and say goodbye. Angelique, in her opinion, was about to do this when the radio of the correctional officer standing nearby. went off and startled the child, who then left with her other siblings. The counselor also testified that there were twelve visits at the prison to date and she only observed one. In addition, she viewed herself as a helper to those individuals she counsels as she tries to assist them in any way she can.
The social worker's impressions and testimony were somewhat more negative. The social worker stated that Angelique was often difficult to transport, as she was on this day. She would scream and get stiff when it was time to be put in the car. She was difficult to place into the car seat. She would cry hysterically and she did cry during this whole trip. She saw this child as less involved with her mother, much as Dr. Rosado viewed the children during his interactional session with the children and Milagros.
5. Josephine G., the maternal grandmother and her Motion to TransferCT Page 11767 Guardianship
The maternal grandmother was permitted to intervene on a limited basis in the termination petitions and to present testimony regarding disposition. She testified briefly and her counsel made an oral motion for transfer of guardianship at the close of the trial. Josephine stated that she wanted to have both children with her and that there "was nothing better than a family together." Both Milagros and Angel understand that, due to their incarceration they cannot care for Angelique at the present time. Both believe that the termination petition as to this child should be denied and a transfer of guardianship to Josephine is the outcome that they advocated.
None of Milagros's children were ever placed by DCF with their grandmother. As noted, the two oldest were placed with their maternal grandfather and his wife. Pedro also remained with them briefly, Angelique has always resided in a non-relative foster care placement. The central issue for the court in considering the maternal grandmother's claim is what is the relationship that exists between her and the children and would she be able to provide the care that they require. Dr. Rosado evaluated the maternal grandmother on several occasions when dealing with the children and the family. In his most recent evaluation, he noted that Josephine minimized the difficulties she had had with Milagros in the past. She did not openly discuss Milagros' limitations and her own issues concerning mental health treatment. The psychological testing he performed suggested to him that Josephine might have some possible neurological impairment as she had difficulty with visual motor coordination. Further, and more important, he observed significant problems in the interactional session with her grandchildren. He noted that the children did not respond to her and that "she was unable to display any leadership qualities or appropriate parental acts. The children never displayed any behavior which would suggest any positive attachment towards (her) or that they see their maternal grandmother as a source of support or security."[11] The court credits his testimony and findings and concludes that neither child has a close relationship with Josephine. Also, there are significant questions as to whether she could provide proper care for them.
 C. MOTION TO DISMISS
At the close of the petitioner's case, the respondent mother made a motion to dismiss the petitions. Connecticut Practice Book (Rev. 1998) § 15-8 permits the court to dismiss a case "whenever it determines that, after the plaintiff has produced his evidence and rested his cause, the plaintiff has presented insufficient evidence to establish a prima facie case against the defendant." Season-All Industries, Inc. v.CT Page 11768R. J. Grosso, Inc., 213 Conn. 486, 493, 569 A.2d 32 (1980). In considering and ruling on a motion to dismiss, the court must determine whether "sufficient evidence has been submitted to raise an issue to go to the trier of fact." New England Savings Bank v. Bedford Realty Corp.,246 Conn. 594, 608, 712 A.2d 713 (1998). "The evidence must be such that, if credited, it would be sufficient to establish the fact or facts it is introduced to prove." Berchtold v. Maggi, 191 Conn. 266, 270,464 A.2d 1 (1983). In evaluating the motion, the plaintiff's evidence "is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor." Angelo Tomasso, Inc. v. Armor Construction andPaving, Inc., 187 Conn. 544, 548, 447 A.2d 406 (1982). "A plaintiff has failed to make out a prima facie case "when the evidence produced by the plaintiff if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff."Rosenfield v. Cymbala, 43 Conn. App. 83, 91, 681 A.2d 999 (1996), citingMinicozzi v. Atlantic Refining Co., 143 Conn. 226, 230, 120 A.2d 924
(1956).
Viewing the evidence in the light most favorable to the petitioner, the court does conclude that the petitioner failed to establish even a primafacie case as to the ground of no ongoing-parent child relationship alleged against Milagros G. and Angel M. regarding Angelique. This is so because the Connecticut Supreme Court in the case of In re Valerie D.,223 Conn. 492, 613 A.2d 748 (1992) holds that this ground does not past constitutional muster when applied to biological parents whose child has been removed from them at birth, the facts established here. Further, a review of the summary of facts attached to the termination petition reveals no allegations which, if proven, could or would establish, aprima facie case for the ground that the mother had committed acts of omission or commission against Angelique. Accordingly, these two grounds are dismissed as to Milagros. The failure to have an ongoing parent-child relationship is also dismissed as to Angel M. The court denies the motions as to the other grounds and concludes that the Petitioner established a prima facie case as to each parent's failure to rehabilitate, Milagros's infliction of injury on Pedro as well as Angel M.'s abandonment of Angelique.
 D. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification, Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to CT Page 11769 benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). The court made such findings on October 14, 1998. (Rogers, J.) The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of these findings. Such efforts were hampered by Milagros' inability to benefit from such services and her criminal conduct. In Angel's case, they were hampered by his incarceration and his lack of regular participation when he was at liberty in the community. As to John or Julio Doe, he was never involved with the family so that services could have been offered to him.
2. Adjudicatory findings
 (a) Milagros G.
Both Pedro and Angelique were adjudicated neglected and committed to the care and custody of DCF for a period of twelve months just a month after Angelique's birth, on September 3, 1997. Their commitments have been extended on several dates since that time. The court further finds, by clear and convincing evidence, that as of December 15, 1998, Milagros had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B). She will remain incarcerated at least for another one and a half years, if not two. She was not able to benefit from the many services offered to her so that she could become a responsible parent.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722
(1989), In re Hector L., 53 Conn. App. 359, 366-367, 730 A.2d 106
(1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Milagros' conduct prior to the filing of the petitions, but also her conduct after that time. In this case, this was a period of less than two years, during which time there has been no change. Angelique has been with the same family her entire life. Pedro has been there for some considerable time. This family has provided emotional nurturing to both Pedro and Angelique. Pedro has only CT Page 11770 negative memories of his mother. Angelique has no bonded relationship with her mother. It is, all the experts agree and the court concurs, not in Pedro or Angelique's best interests to re-establish a tie to Milagros and the court so finds, from the clear and convincing evidence.
The second ground alleged against Milagros is that the children have been denied, by reason of an act of commission or omission, the care, guidance or control necessary for his physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112 (c)(3)(C) "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S., 29 Conn. App. 600, 614,616 A.2d 1161 (1992), see also In re Theresa S., 196 Conn. 18, 25-27,491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171, cert denied, 218 Conn. 904, 588 A.2d 1078 (1991).
The clear and convincing evidence has established this ground as to Pedro only. The court has previously dismissed this ground as to Angelique. The court does find Milagros's admission and statement to the police in 1997 credible. The court finds that the statement reflects the truth of what happened to Pedro while in the care of his mother. The court finds that evidence concerning those injuries indicates that they were serious. Pedro was the victim of chronic injuries to his left femur, left tibia and humerus as reflected in the x-rays reviewed in 1997 and the various physicians opinions about those x-rays just before the order of temporary custody was granted in June, 1997.
(b) Angel M.'s Failure to Rehabilitate and Abandonment of Angelique.
There is clear and convincing evidence of Angel's failure to rehabilitate. He has not taken the steps necessary to conform his conduct to societally acceptable norms. While he has completed drug programs while incarcerated, he was unable to remain drug free once released. Further, he will be incarcerated for some time and at least a year or two more of actions showing his changed behavior would be necessary before it would be reasonable to consider placing Angelique with him. She requires permanency soon. She has been in foster care all her life, three years, and during that length of time, Angel has not made any significant changes in his life to accommodate being a parent to her. The court concludes that there is no prospect that he can be rehabilitated at some reasonably foreseeable time in the future.
The petition also alleges that Angel has abandoned Angelique as that is defined in Connecticut General Statutes § 17a-112 (c)(3)(A) as a parent failing to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. While Angel, during the CT Page 11771 time prior to the filing of the termination petition, had exhibited a reasonable degree of interest by seeking regular visitation, the court finds that his conduct and repeated criminal activity does not reflect that he has maintained a "reasonable degree of responsibility" for his biological daughter. He has not abandoned them in the colloquial sense of the word, but within the legal meaning of the term, he has done so and the court so finds from the clear and convincing evidence.
(c) John or Julio Doe, the putative father of Pedro G.
Pedro G. has never known a biological father. The court finds that DCF made reasonable efforts to locate this unknown biological parent. The court finds, from the clear and convincing evidence, that John Doe abandoned Pedro. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14, 438 A.2d 801 (1981). John Doe was never involved in the life of this child. His identity and whereabouts are unknown.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These include services to benefit the children, referrals for Milagros to deal with issues of parenting and substance abuse as well as substance abuse referrals and treatment for Angel. DCF also provided visitation and case management services to both these parents. No services were provided to John Doe as he never came forward to request any and his identity is unknown.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and none of the parents was able to benefit from them. In addition, the court found on October 14, 1998 that further efforts for reunification were not appropriate. None were possible to be made for John Doe.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Milagros and Angel in the neglect proceedings and that neither was minimally able to fulfill them. None were set for John Doe.
4) The feelings and emotional ties of the children with respect to the CT Page 11772 parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Angelique has been in her present foster home all her life and views her foster family as her family. Pedro has been there for almost two years and is bonded to the family.
5) Finding regarding the ages of the children: Pedro is four and Angelique is three years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family.
 E. DISPOSITION The Best Interests of the Children.
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the children at issue. As has been noted:
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds CT Page 11773 to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that grounds for termination of the parental rights of the biological parents of the children have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence that these children cannot wait any longer for permanency.
The court must now consider whether or not placement of Pedro and Angelique with their maternal grandmother is in their best interests. The court finds that Josephine G. is well meaning and cares about her grandchildren. How, ever, the court further finds from the clear and convincing evidence, that she does not have a close relationship with them and is not aware of their special needs. She does not have the skills necessary to parent them. The court therefore denies the motion for transfer of custody and guardianship to her.
Next, the court must examine whether it is in the best interests of the children to terminate their parents' rights to them. The clear and convincing evidence concerning Pedro's unknown father has gone unchallenged and the court concludes that this child requires permanency. The court concludes that termination of his unknown father's rights to him is in his best interests.
While Milagros clearly loves Pedro and Angelique, she will not be available to care for them in the near future. Neither can Angel care for Angelique. Milagros cannot care for any child without having a parent figure available to assist her twenty-four hours a day and Angel has not made any changes in his life to do so. The psychologist has found that the children have done well with their present foster parents, who have the personal characteristics to be able to provide for these special needs children. The court credits this testimony. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). In addition, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930
(1992). CT Page 11774
The court concludes, from the clear and convincing testimony, that it is in the best interests of these two children to have permanency and stability in their lives. Towards that end, the court concludes that it is in Pedro and Angelique's best interests that their parents' rights to them be terminated.
The court therefore orders that a termination of parental rights enter with respect to Milagros G., Angel M. and John Doe. The foster parents have expressed a desire to adopt these children and the court directs that they be given first consideration in any adoption. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The courts further orders that a permanency plan for Pedro and Angelique be submitted within sixty days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session